**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JUANDANIEL MEDINA,<br><br>Defendant. | Case No.  25mj3169<br><br>COMPLAINT FOR VIOLATION OF<br><br>18 U.S.C. §§ 545 -<br>Importation Contrary to Law (Felony) |

The undersigned complainant, being duly sworn, states:

<u>COUNT 1</u>

On or about May 26, 2025, within the Southern District of California, defendant JUANDANIEL MEDINA, did knowingly import merchandise, to wit: seven (6) Red-lored Amazon parrots (*Amazona autumnalis*) and one (1) Amazon parrot of unknown species, contrary to law, that is, Title 16, United States Code, Sections 1538(c) and 1540(b), in violation of Title 18, United States Code, Section 545.

The complainant states that this complaint is based on the attached Statement of Facts incorporated herein by reference.

*Victoria Van Duzer*
_____
Victoria Van Duzer, Special Agent
U.S. Fish and Wildlife Service

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1 on June 6, 2025.

_____
HON. DANIEL E. BUTCHER
U.S. MAGISTRATE JUDGE

**STATEMENT OF FACTS**

According to Customs and Border Protection (CBP) reports, on May 26, 2025, at approximately 9:41 am, Juandaniel MEDINA entered the United States from Mexico at the Otay Mesa Port of Entry. MEDINA was the driver of a 2022 GMC Sierra pickup truck bearing a California license plate. MEDINA was also the registered owner of the vehicle. There was a front seat passenger in the truck, identified as MEDINA's girlfriend, Jennifer Souhail GARCIA.

According to CBP reports, at the primary inspection booth, the CBP officer asked MEDINA where he was going and MEDINA answered, Lindsay, California.  The officer then obtained two negative customs declarations from MEDINA. The officer performed a cursory inspection of the vehicle and observed a commercial quantity of food, candy, chips, soda, and alcohol within the vehicle. The vehicle, along with MEDINA and GARCIA, were referred to secondary inspection based on a computer-generated alert.

In the secondary inspection lot, CBP reports show that a canine officer was advised of the vehicle being referred to secondary inspection due to a computer-generated alert. The officer conducted a screen (consisting of a canine sniff) of the vehicle with a Human and Narcotics Detection Dog. The dog did not alert to trained odor but, during the screen, the officer observed a small cardboard box on the passenger floorboard. The box was observed to have several small holes poked into it. The canine officer opened the box and observed seven birds.



*Cardboard box on the passenger floorboard; one of the captive birds peering out from inside the box*

A CBP Agricultural Specialist responded and removed seven birds from the vehicle. The birds were preliminarily identified by a U.S. Fish and Wildlife Service (USFWS) Wildlife Inspector as six Red-lored Amazon parrots (*Amazona autumnalis*) and one Amazon parrot of unknown species. The birds were placed in a bird cage with food and water until they could be cared for by Veterinary Services. The Amazon parrots were juveniles. The CBP Agricultural Specialist suspected the parrots had been sedated due to their relaxed demeanor. The CBP Agricultural Specialist observed the parrots again several hours later and stated that they appeared livelier than they had been at the time during the seizure, bolstering suspicions of prior sedation.

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

2



*The seven Amazon parrots seized from GARCIA's truck*

A Homeland Security Investigations Special Agent and myself arrived to investigate at approximately 12:00 pm. After waiving his Miranda rights in writing, MEDINA agreed to an interview. MEDINA reported that he purchased the birds in Tijuana, Mexico the morning of Monday, May 26, 2025, from an acquaintance of his that he declined to name. He paid $700 cash for the seven parrots. MEDINA became aware of the parrots for sale through word of mouth. MEDINA is familiar with the parrots because he had two of the same kind when he was growing up. He referred to them as "red parrots." He reported that he planned on bringing the parrots back to his residence in Lindsay, California where he would house them in cages. He planned on selling some of them and keeping some to breed and sell the offspring in the future. MEDINA reported that the parrots can sell for $1,000 at pet stores.

After picking up the birds in Tijuana, according to MEDINA, he pulled over in a shopping area approximately thirty minutes from the border to feed the birds and keep

3

them quiet for the crossing checkpoint. MEDINA fed the parrots bird food mixed with water using a syringe. MEDINA claimed he had no knowledge of the birds being sedated at any point.

During the interview, MEDINA admitted that he knew he was not allowed to bring the parrots into the United States without permits or documentation. He said that he has previously been caught bringing beer into the United States, and he is aware of the rules about smuggling. MEDINA thought if he got caught with the parrots, it would be similar to when he was caught with beer, and he might get something similar to a warning.

After waiving her Miranda rights in writing, GARCIA also agreed to an interview. GARCIA stated that she was aware of the parrots within the vehicle. She reported that earlier that morning, she saw MEDINA texting on his phone. He told her, "Hey they're going to sell me some birds." MEDINA then left for approximately fifteen minutes and came back carrying a cardboard box containing the birds. He placed it on the passenger floorboard in front of GARCIA. The birds were asleep and not making any noise. GARCIA has not known MEDINA to own or have an interest in birds before, but he is an "animal lover" and she assumed he was going to use them to promote the grand opening of his t-shirt business. GARCIA said she did not know who sold GARCIA the birds.

According to CITES databases, Red-lored Amazon parrots (*Amazona autumnalis*) are listed on Appendix II, meaning they are not presently threatened with extinction but may become so if their trade is not regulated. Indeed, all Amazon parrot species are either Appendix I or II. Any trade in Amazon parrots of any species therefore must be documented and permitted under CITES rules.

No documentation or other paperwork related to the parrots was located in the vehicle or in the possession of MEDINA or GARCIA. According to USFWS's review of government records, at the time of importation, neither MEDINA nor GARCIA possessed a license from USFWS to import wildlife, nor did they possess or file a form 3-177. They did not possess a CITES export permit, certificate of origin, or other CITES documentation that would permit them to lawfully import the parrots. Furthermore, the concealment of

4

the birds would have resulted in their entering the United States without any quarantine period or process.

MEDINA was served with a Notice to Appear in court on June 10, 2025, for violation of Title 18, United States Code, Section 545. The parrots were taken to a quarantine facility run by the U.S. Department of Agriculture Veterinary Services. Currently, all the parrots are alive.

## Legal Framework

CITES is an international agreement among approximately 183 governments, including the United States and Mexico, to protect fish, wildlife, and plants that may become threatened with extinction. CITES establishes import and export restrictions to protect these species from overexploitation through international trade. Under CITES, species are protected according to a classification system known as "appendices." International trade in species listed in these appendices is monitored and regulated by permits and quotas. The permit restrictions apply to live and dead specimens and skins, parts, and products made in whole or in part from a listed species. The Endangered Species Act prohibits any person subject to the jurisdiction of the United States from engaging in any trade or possessing any specimens contrary to the provisions of CITES. 16 U.S.C. §1538(c)(1).

Wildlife and plant species listed in Appendix I of CITES are threatened with extinction. Those listed in Appendix II of CITES include species not presently threatened with extinction but may become so if their trade is not regulated. Appendix II species may be allowed in trade but are strictly regulated and monitored. To import an Appendix II species into the United States, the exporter must obtain a valid "foreign export permit" issued by the specimen's country of origin before importation. Appendix III of CITES includes wildlife and plant species listed by CITES member countries as requiring international trade controls to prevent unsustainable or illegal exploitation of the species. International trade in such species is allowed only when the appropriate permits or certificates are presented. Pursuant to the federal regulations implementing CITES, an

5

official CITES document is required to accompany all wildlife imports or exports of a species listed on a CITES Appendix.

In addition, all wildlife imported into the United States must be declared to the USFWS. A true and complete declaration Form 3-177, Declaration for Importation or Exportation of Fish or Wildlife, must be filed at or before the time of importation. 16 U.S.C. § 1538(e); 50 C.F.R. § 14.61. Federal regulations also require that USFWS clear all wildlife imported into the United States, and that the importer or his agent make available the wildlife being imported to the officer and all required permits, licenses, or other documents. 50 C.F.R. § 14.52.

The lawful importation of parrots covered by Appendix II of CITES requires the importer to provide a CITES export permit or re-export to USFWS at the time of import or export, 50 C.F.R. §§23.36 and 23.37, and if the birds were listed on Appendix I, in addition, a CITES import permit would be required, pursuant to 50 C.F.R. §23.35.  50 C.F.R. §23.20(e). Section 1538(e) and applicable regulations further require the importer to file a USFWS 3-177 declaration form, which provides information such as the species, the quantity, the name and address of the recipient, and the intended use of the wildlife. 50 C.F.R. §50.63. Additionally, user fees (50 C.F.R. §14.94), and 48-hour notice (50 C.F.R. §14.54) must be provided.

To obtain clearance for the import of wildlife, the exporter must provide to inspectors at the border, together with the wildlife, all shipping documents (including waybills, bills of lading, packing lists and invoices); all permits, licenses and documents required by the laws and regulations of the United States; and all permits or other documents required by any foreign country involved in the transaction. 50 C.F.R. §14.52.

In addition, to import many types of wildlife, the wildlife must be subject to quarantine before it can be introduced into the United States.  Many animals have diseases that can be transferred to humans (zoonotic diseases) or other animals that can have disastrous health effects to human or animal populations. For example, birds can carry and spread Avian influenza (bird flu), psittacosis, and histoplasmosis. Bird flu is highly

contagious and can cause flu like symptoms, respiratory illness, pneumonia and death in humans and other birds including birds in United States poultry farms. Many other diseases that can be transmitted from different animals and can have disastrous effects, that is why it is necessary to quarantine animals entering the United States to limit and safeguard against this potential disease transmission.